Sandra Kay BATTISTA; Joan Renee Taylor; Douglas Fabbri; Laurie Lou Chandler; Sherry Leysen; Karen A. Marino; Patsy D. Thompson; Bobbie J. McNeil; Mary Marsicano; Shirley A. Van Buskirk; Erika Rivero; Robert B. Faternick; Donald J. Bruyn; Annette Hanson; Julie C. Mazo; Constandeanna Elenie Wright; Glenda C. Moberg; Pamela A. Fairchild; Rebecca L. Smith; Cathy Lynn Fulton-Maloney; Harold Richard Norbrothen; Deborah Jane Tafoya; Carmen Razo; Robert

Edward Steele; David S. Gordon; Linda Susan Aubin; Gilbert Fonseca; Mary Kellogg; Lisa M. Kelsey; Laura Lilly; Carole Meyers; James W. Pilgrim; Sarah E. Rodriguez; Nancy L. Shipman; Shawn Alison Shoemaker; Donna Smith; Jackie Todd; Courtney Wight; Cheryl C. Zweber; Carol Ann Okon; Lois A. Marcus; James L. Lauritzen; Valerie A. Hussey; Roberta L. Facchina; Ina Hahn; Diane Jo Allen; Tracy A. Allen; Carol Dignard; Hasmik Keyribaryan; Cathy Kiaha; George Klasser; Evodio Medina; Violette Naaman; Kimberly Jo Oliva; Hasmik Pashaie; Susan J. Rossi; Maria Del Carmen Contreras; John U. Crandall, III; Jan M. Eisenbeisz; Kyle Lance Miller, Plaintiffs–Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, appointed receiver of Bank of Newport, a failed depository institution, Defendant–Appellee.

No. 97–56747.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1999.

Decided Nov. 2, 1999.

James Toledano, Toledano & Wald, Irvine, California, for the plaintiffs-appellants.

Roberta H. Clark, Federal Deposit Insurance Corporation, Washington, D.C., for the defendant-appellee.

Before: BOOCHEVER, O'SCANNLAIN, and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

Sandra Kay Battista and other former employees (collectively "Battista" or "employees") of the Bank of Newport ("Bank") appeal an order of the district court that permitted the Federal Deposit Insurance Corporation ("FDIC") to pay a judgment to the employees in receiver's certificates rather than in cash. The employees also appeal the district court's refusal to award prejudgment interest. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

The Bank, a financial institution insured by the FDIC, had a severance policy that provided severance and separation payments to employees terminated without just cause. In 1994, the California Superintendent of Banks declared the Bank insolvent and the FDIC was appointed its receiver. Pursuant to its authority under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), the FDIC repudiated the employees' contracts, including the agreements regarding severance and separation payments. The employees timely filed claims with the FDIC for their severance and separation payments, which the FDIC disallowed.

The employees brought suit against the FDIC seeking damages for their severance and separation pay, interest, and attorney's fees and costs. The parties entered into a Stipulated Pretrial Conference Order, in which they stipulated that a trial of the facts was unnecessary. In addition to agreeing on a number of facts, the parties stipulated to the FDIC's authority to repudiate the severance and separation pay agreements under FIRREA and to the resulting liability of the FDIC, as receiver, for damages under 12 U.S.C. § 1821(e)(3).[1] Two issues remained: (1) whether the employees were entitled to payment of the judgment in cash rather than in receiver's certificates; and (2) whether the FDIC was liable for prejudgment interest on the employees' damages.[2]

The district court subsequently granted the FDIC's motion that it be allowed to satisfy the judgment by payment with receiver's certificates and that the employees were not entitled to prejudgment interest, and entered judgment against the FDIC.[3] The employees timely appealed.

## II.

[ ] The interpretation of a statute is a question of law reviewed de novo. *See*

---

1. All subsequent statutory references and citations are to Title 12, United States Code.

2. The collective judgment for the various employees, without interest, was $731,354.80.

3. The employees' motion for reconsideration was denied.

*Alexander v. Glickman*, 139 F.3d 733, 735 (9th Cir.1998). Whether prejudgment interest is permitted is a question of law reviewed de novo. *See Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 921 (9th Cir.1995).

### III.

Congress enacted FIRREA in 1989 in response to the nation's banking crisis. *See Sharpe v. FDIC*, 126 F.3d 1147, 1154 (9th Cir.1997). The statute "allows the FDIC to act as receiver or conservator of a failed institution for the protection of depositors and creditors," *id.*, establishing a scheme for dealing with claims against the failed institution.

Section 1821(d) of FIRREA outlines the powers and duties of the FDIC as conservator or receiver, authorizing the agency to, *inter alia*, determine and pay claims against the financial institution in accordance with the subsection's requirements. Subsections 1821(d)(3)-(6) set forth the procedures for the determination of claims, and § 1821(d)(11) establishes a distribution priority for claims to the financial institution's assets.

■ Subsection 1821(e) authorizes the FDIC, as receiver, to repudiate any contract of the insolvent financial institution it deems burdensome, so long as the repudiation of the contract will promote the orderly administration of the financial institution's affairs, *see* § 1821(e)(1), and the repudiation is made within a reasonable time of the receiver's appointment, *see* § 1821(e)(2). Repudiation gives rise to an ordinary contract claim for damages. *See*

*Howell v. FDIC*, 986 F.2d 569, 571 (1st Cir.1993). FIRREA, however, limits damages for repudiation to those enumerated in § 1821(e)(3): "actual direct compensatory damages" determined as of "the date of the appointment of the conservator or receiver." [4] The question we must decide is whether a claim for damages under § 1821(e) based on a repudiated contract is subject to the payment scheme outlined in § 1821(d), or whether, as Battista claims, subsection (e) establishes a separate right to payment.

### A.

■ There is no question that the FDIC may pay creditors with receiver's certificates instead of with cash. *See RTC v. Titan Fin. Corp.*, 36 F.3d 891, 892 (9th Cir.1994) (per curiam). Section 1821(d)(10)(A) authorizes the FDIC, as receiver, to "pay creditor claims ... in such manner and amounts as are authorized under this chapter." In *Titan*, we reasoned that the FDIC may use receiver's certificates as its manner of payment because requiring cash payments would subvert the comprehensive scheme of FIRREA, including § 1821(i)(2)'s limitation on an unsecured general creditor's claim to only a pro rata share of the proceeds from the liquidation of the financial institution's assets. *See Titan*, 36 F.3d at 892 (citing *Franklin Bank v. FDIC*, 850 F.Supp. 845 (N.D.Cal.1994)). To require the FDIC to pay certain creditors in cash would allow those creditors to "jump the line," recovering more than their pro rata share of the liquidated assets, if the financial institution's debts exceed its assets. *See id.*

---

**4.** Subsection 1821(e)(3) provides:

**(A) In general**

Except as otherwise provided in subparagraph (c) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be—

(i) limited to actual direct compensatory damages; and

(ii) determined as of—

(I) the date of the appointment of the conservator or receiver; or

(II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.

**(B) No liability for other damages**

For purposes of subparagraph (A), the term "actual direct compensatory damages" does not include—

(i) punitive or exemplary damages;

(ii) damages for lost profits or opportunity; or

(iii) damages for pain and suffering.

§ 1821(e)(3)(A)-(B).

(quoting *Franklin Bank,* 850 F.Supp. at 849).

Attempting to extricate her case from *Titan* 's seemingly dispositive holding, Battista argues that § 1821(d) does not govern situations in which the FDIC has repudiated a contract pursuant to § 1821(e). Specifically, she argues that Congress established two different types of claims: (1) approved claims under § 1821(d), which are payable with receiver's certificates from the assets of the financial institution; and (2) damages for repudiation under § 1821(e), which are payable only in cash. Analyses of § 1821's text, a related FDIC regulation, and case law, however, point to the conclusion that § 1821(e) is better interpreted as being subject to the various provisions of § 1821(d).

### 1. Section 1821's Plain Language

Contrary to Battista's argument, little in § 1821 indicates that Congress intended to establish two distinct types of non-depositor claims, beyond the fact that Congress provided for damages for repudiation in subsection (e), while discussing the claims payment process in subsection (d).

Battista points to the different time lines established in §§ 1821(d) and (e) for the making of claims. She notes that while § 1821(d) requires creditors to file claims within a specified period of time after receiving notice of the financial institution's liquidation, *see* § 1821(d)(3)(B)(i), and requires the FDIC to approve or reject those claims within 180 days of their filing, *see* § 1821(d)(5)(A)(i), the FDIC need only repudiate a contract under § 1821(e) within a "reasonable period" following its appointment as receiver, § 1821(e)(2). From this difference, Battista concludes that § 1821(e) creates a "full-blown absolute right to seek damages for the repudiation."

Battista also argues that Congress must have created two types of claims because § 1821(d) speaks in terms of "approved claims" or "disallowed claims," while § 1821(e) refers only to "claims for damages." According to Battista, the principle of statutory construction that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally ... in the disparate inclusion or exclusion," *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citation omitted) (internal quotation marks omitted), requires us to find that damages, which are not mentioned in § 1821(d), are not included within § 1821(d)'s framework.

The absence of specific deadlines or references to "approved" or "disallowed claims" in § 1821(e), however, also supports the contrary conclusion that § 1821(e) does not establish a separate regime from § 1821(d). There is no reason to repeat § 1821(d)'s requirements in § 1821(e), if § 1821(e) claims are to be dealt with under § 1821(d).[5] Similarly, Congress had no reason to speak of "approved claims" or "disallowed claims" in § 1821(e), if subsection (e)'s function was only to limit the damages that a claimant could seek for repudiation—damages that would either be approved or disapproved under the scheme established in subsection (d). That is, damages in § 1821(e) are merely a subset of the claims discussed in § 1821(d). This interpretation of § 1821 is more plausible than Battista's for several reasons.

First, if Congress had wished to depart from the § 1821(d) regime for claims for damages under § 1821(e), presumably it would have said so. In fact, it did just that in § 1821(f) with respect to the payment of insured deposits:

> In case of the liquidation of ... any insured depository institution, payment

---

5. The same response can be made to Battista's argument that Congress must not have intended damages under § 1821(e) to be paid from the financial institution's assets because § 1821(e) does not state that damages are to be so paid. Subsection (e)'s silence is equally interpretable as evidence that Congress intended such claims to be resolved pursuant to subsection (d).

of the insured deposits ... shall be made by the Corporation as soon as possible ... either by cash or by making available to each depositor a transferred deposit in a new insured depository institution ... in an amount equal to the insured deposit of such depositor, except that—

(A) all payments máde pursuant to this section on account of a closed Bank Insurance Fund member shall be made only from the Bank Insurance Fund....

§ 1821(f)(1).

Second, it is unlikely that Congress would have provided such extensive guidelines for claims under § 1821(d) but neglected to even mention the presentation and payment of claims under § 1821(e), if it had intended for the two subsections to be mutually exclusive.

Third, Congress has limited the FDIC's liability, as a receiver, to the assets of the insolvent financial institution, unless the FDIC chooses to make additional payments from the Bank Insurance Fund:

The maximum liability of the Corporation, acting as receiver or in any other capacity, to any person having a claim against the receiver of the insured depository institution for which such receiver is appointed shall equal the amount such claimant would have received if the Corporation had liquidated the assets and liabilities of such institution....

§ 1821(i)(2). Subsection 1821(i) gives no indication that its provisions are limited to claims under § 1821(d).

Fourth, the distribution priority in § 1821(d)(11)(A), which was added to § 1821 in 1993, makes little sense if parties injured by repudiations under § 1821(e) are treated separately from parties with claims under § 1821(d). Section 1821(d)(11)(A) provides, in relevant part:

Subject to section 1815(e)(2)(C) of this title, amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:

(i) Administrative expenses of the receiver.

(ii) Any deposit liability of the institution.

(iii) Any other general or senior liability of the institution (which is not a liability in clause (iv) or clause (v)).

(iv) Any obligation subordinated to depositors or general creditors (which is not an obligation described in clause (v)).

(v) Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

§ 1821(d)(11)(A). This provision does not mention claims based on damages for repudiation. If claims under § 1821(e) were to be treated differently from claims under § 1821(d), however, one would have expected Congress to have given § 1821(e) claims a place in § 1821(d)(11)'s hierarchy. After all, § 1821(d)(11) includes depositors, for whom § 1821(f) establishes a separate track for the making and paying of claims.[6]

---

6. We note also that § 1821(e) expressly requires the application of § 1821(d) and (i) to the repudiation of a service contract. Although the term "service contract" is not defined in the statute, it may well include a contract for severance pay because severance pay is part of the compensation package that constitutes an employee's wages. *Cf. Monrad v. FDIC,* 62 F.3d 1169, 1173–74 (9th Cir. 1995) (finding severance payments to constitute consideration for employee's entering into an at will employment relationship); *Of-* *fice & Prof'l Employees Int'l Union v. FDIC,* 27 F.3d 598, 603–04 (D.C.Cir.1994) (same). Thus, this factor also appears to support construing § 1821(e) claims as being subject to the distribution scheme of § 1821(d). Because we conclude that § 1821(e) contract repudiation claims are subject to the distribution scheme of § 1821(d), we need not decide today whether a severance pay claim is a claim "for services performed before the ap-

In sum, the text of § 1821 strongly suggests that § 1821(e) claims are subject to the distribution priority scheme of § 1821(d).

### 2. FDIC Regulations

■ FDIC regulations regarding the definition of administrative expenses in § 1821(d)(11) also support this conclusion. Agency interpretations of this sort deserve significant deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (courts have "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer") (footnote omitted); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (agency's interpretation of its own regulations must also be given "substantial deference" and is to be disregarded only if "it is plainly erroneous or inconsistent with the regulation") (citation omitted) (internal quotation marks omitted).

Under § 1821(d)(11)'s distribution priority, the receiver's administrative expenses are paid ahead of all other claims. *See* § 1821(d)(11)(A)(i). In 1993, the FDIC promulgated an interim rule, which was fully adopted in 1995 as 12 C.F.R. § 360.4 (1999), that defines "administrative expenses" as including "those necessary expenses incurred by the receiver in liquidating ... a failed insured depository institution. Such expenses shall include pre-failure and post-failure obligations that the receiver determines are necessary and appropriate to facilitate the smooth and orderly liquidation or other resolution of the institution." Significantly, the FDIC noted in its discussion of the interim rule that administrative expenses "[g]enerally ... do not include expenses such as severance pay claims, golden parachute claims and claims arising from contract repudiations." 58 Fed. Reg. 43,069, 43,070 (1993). Thus, the FDIC interpreted § 1821(d)(11)'s priority scheme as including claims for damages arising from contract repudiation under § 1821(e), but not entitled to the same priority as administrative claims.

### 3. Case Law

Battista contends that there is no case law establishing that damages claims under § 1821(e) are equivalent to other creditor's claims under § 1821(d). The FDIC argues, in contrast, that it is well-established that claims against the FDIC for actions taken in its capacity as receiver must comply with the administrative process established in § 1821(d)(3)-(6), thereby suggesting that the two types of claims are not distinct.

Battista relies on our decision in *Sharpe*, in which we considered whether parties aggrieved by the FDIC's *breach* of a contract held a § 1821(d) "claim" that would be subject to FIRREA's administrative exhaustion requirement. We concluded that they were not subject to the § 1821(d) claims process; however, we expressly noted the difference between the FDIC's *breaching* a contract and *repudiating* a contract. *See Sharpe*, 126 F.3d at 1157 ("Had the FDIC followed the § 1821(e) procedure in disaffirming the settlement agreement with the Sharpes, this would have been a very different case.").[7] Thus, contrary to Battista's contention, *Sharpe* did not hold that claimants whose contracts had been *repudiated* were not subject to the claims process of § 1821(d).

*Monrad v. FDIC*, 62 F.3d 1169 (9th Cir.1995), and *Heno v. FDIC*, 20 F.3d 1204 (1st Cir.1994), upon which Battista also relies, offer no help. *Monrad* held only that the FDIC is liable for severance pay-

pointment of ... the receiver" under § 1821(e)(7).

7. We left open in *Sharpe* the question of whether § 1821(e) is subject to § 1821(d)'s exhaustion requirement. *See* 126 F.3d at 1157 n. 7. Whether claims under subsection (e) must satisfy the jurisdictional bar is immaterial here because Battista exhausted the administrative claims process.

ment damages when it repudiates an employment contract, a question that is not at issue here. *See Monrad,* 62 F.3d at 1172. And *Heno* does not address whether a § 1821(e) claim for damages is subject to the § 1821(d) process; in fact, it seems to assume in dicta that it is. *See Heno,* 20 F.3d at 1209 (including contract repudiation claims in its discussion of the FDIC's ability to evaluate claims submitted after the statutory bar date in § 1821(d)(5)).

■ Battista further argues that the district court erred by concluding that FIRREA preempts California law that requires all wages to be paid in cash.[8] This argument, however, ultimately rests on the assumption that claims for damages under § 1821(e) are not subject to the distribution priority of § 1821(d)(11)(A). Because we conclude to the contrary, this argument fails.

Section 1821(d)(11)(B)(i) notes that the distribution priority established in subparagraph (A) "shall not supersede the law of any State except to the extent such law is inconsistent with the provisions of such subparagraph, and then only to the extent of the inconsistency." Requiring the FDIC to pay Battista's judgment in cash surely would be inconsistent with the distribution priority in § 1821(d)(11)(A). It would, as the FDIC correctly contends, "in effect elevate those whose severance contracts the FDIC as receiver has repudiated to the super priority status that Congress accorded only to administrative expenses." Claimants under § 1821(e) would be guaranteed payment in full, while other claimants would be limited to their share of whatever bank assets were left over.

■ In light of the text of § 1821, FDIC regulations, relevant case law, and the pre-emption of possibly contradictory state law, we conclude that the district court did not err in refusing to require the FDIC to pay Battista's judgment in cash.

B.

■ The employees also argue that they are entitled to prejudgment interest on the amount of their judgment. In *Far West Fed. Bank, S.B. v. Office of Thrift Supervision–Dir.,* 119 F.3d 1358 (9th Cir.1997), however, we held that sovereign immunity bars an award of interest against the FDIC. Congress has not expressly waived the FDIC's immunity against prejudgment interest, nor does the FDIC fall under the exception of the government's waiver immunity when it operates as a commercial enterprise. *See id.* at 1366–67. We therefore conclude that the district court did not err in refusing to grant the employees prejudgment interest.

The employees argue that *Far West* is both distinguishable and wrongly decided. They argue, first, that *Far West* is distinguishable from this case because *Far West* did not involve liability arising from the FDIC's actions as a receiver under § 1821(e), which, according to them, take on more of the character of a private enterprise. *Far West,* however, did not limit the FDIC's immunity to certain actions; instead, it characterized the agency as a "governmental, regulatory entity ... not a profit-making enterprise," and, therefore, "not a commercial entity." *Id.; see also Sharpe,* 126 F.3d at 1154 n. 3 (barring prejudgment interest against the FDIC

---

8. Battista relies on two provisions of the California Labor Code: (1) The first defines "wages" as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertainable by the standard of time, task, piece, commission basis, or other method of calculation." Cal. Lab.Code § 200(a) (West 1999).(2) The second provides that payments of wages must be "negotiable and payable in cash, on demand, without discount." Cal. Lab.Code § 212(a). California law treats severance pay as wages.

*See Triad Data Servs. v. Jackson,* 153 Cal. App.3d Supp. 1, 200 Cal.Rptr. 418, 423 (App. Dep't Supr. Ct.1984) ("[P]ursuant to the present day concept of employer-employee relations, the term 'wages' should be deemed to include not only the periodic monetary earnings of the employee but also the other benefits to which he is entitled as part of his compensation.") (internal quotation marks omitted) (citation omitted). It is not entirely clear, however, that California courts would apply § 212(a) to severance pay.

based on sovereign immunity). We fail to see any reason to treat the FDIC's repudiation of a contract under § 1821(e) differently from its abrogation of certain forbearance agreements pursuant to other sections of FIRREA in *Far West.*

■ The employees also argue that *Far West* was wrongly decided. That contention, however, fails because a three-judge panel does not have the authority to overturn the decision of a prior panel. *See Branch v. Tunnell,* 14 F.3d 449, 456 (9th Cir.1994).[9]

### IV.

Because § 1821(e) is better interpreted as subjecting claims for damages for contract repudiation to the claims process of § 1821(d), and to the distribution priority in § 1821(d)(11) in particular, our decision in *Titan* permitting the FDIC to pay claims with receiver's certificates applies to repudiated severance pay claims. Therefore, the district court did not err in refusing to require the FDIC to pay the employees' judgment in cash. Furthermore, under *Far West,* the district court did not err in refusing to award the employees prejudgment interest. Accordingly, the judgment of the district court is

**AFFIRMED.**

---

**9.** The intervening case of *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), does not undermine *Far West*'s holding. *Cf. Branch,* 14 F.3d at 456 (noting an exception to the rule that a panel may not reconsider the decision of another panel when there has been an intervening Supreme Court decision that "undermines the existing precedent ... and both cases are closely on point") (internal quotation marks omitted) (citation omitted). In *O'Melveny,* the Supreme Court noted merely that FIRREA "places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise." *O'Melveny,* 512 U.S. at 87, 114 S.Ct. 2048. It did not suggest that the FDIC was like a private enterprise for purposes of sovereign immunity.